829 So.2d 1166 (2002)
STATE of Louisiana
v.
Terrance P. PRUDHOMME.
No. 02-0511.
Court of Appeal of Louisiana, Third Circuit.
October 30, 2002.
*1168 Honorable Robert Richard Bryant, Jr., District Attorney, Lake Charles, LA, for Appellee State of Louisiana.
Wilson Rambo, Attorney at Law, Monroe, LA, for Appellant/Defendant Terrance P. Prudhomme.
Court composed of NED E. DOUCET, JR., Chief Judge, MARC T. AMY and GLENN B. GREMILLION, Judges.
AMY, Judge.
A jury convicted the defendant of manslaughter. Thereafter, the trial court sentenced the defendant to twenty years at hard labor. The defendant now appeals his conviction and sentence. For the following reasons, we affirm.

Factual and Procedural Background
The events at issue occurred at Angelle Concrete in Lake Charles, Louisiana, on July 22, 2000. The defendant, Terrance Prudhomme, and the victim, Robert Rudd, both worked at Angelle Concrete. At approximately three o'clock in the afternoon, the defendant, Mr. Rudd, and a few other Angelle Concrete employees were in the driver's lounge when an argument erupted between the defendant and Mr. Rudd.
The defendant was using the telephone and gestured to Mr. Rudd that he needed a pen. Mr. Rudd had a pen in his shirt pocket and responded by sticking out his chest toward the defendant to offer the pen. The defendant replied, "Man, I don't want to touch your titties." Mr. Rudd *1169 immediately pulled out a knife and threatened the defendant. Then, the defendant hung up the phone and attempted to calm Mr. Rudd. After he failed to calm Mr. Rudd, the defendant picked up a two-foot long, two-by-four board to force Mr. Rudd to keep his distance. The defendant eventually dropped the board and walked out of the break room stating, "Man, ya'll see this man pulled a knife on me, you're my witness." Thereafter, the defendant saw Anthony Thornton immediately outside of the driver's lounge and stated that Mr. Thornton needed to get a "handle-up" on Mr. Rudd. Mr. Thornton subsequently entered the driver's lounge.
Mr. Rudd remained in the driver's lounge after the defendant left. Although Mr. Rudd appeared to remain agitated by the incident, he put his knife away and made a cup of coffee. But, Mr. Rudd also told the other employees that the defendant was going to get his gun.
While Mr. Rudd remained in the driver's lounge, the defendant walked to his car. Notably, Richard Duhon, an officer with the Lake Charles City Police Department, testified at trial that the distance between the driver's lounge and the defendant's car was three hundred feet. The defendant admitted that he went to his car to get his gun, a Larson 9 mm. semi-automatic pistol. Further, the defendant stated that he put the gun into his pocket and covered the gun with his shirt. The defendant stated that he then returned to the break room to make peace with Mr. Rudd. The defendant said that he took his gun with him when he walked back to the driver's lounge, "to defend myself, and just in case I'd be attacked again."
When the defendant testified at trial, he claimed that he had no other choice other than confronting Mr. Rudd. The defendant explained that he could not leave the work yard because the drivers must remain in the yard until they are told that they can leave for the day. Once he is told that he can leave, the defendant stated that he must refuel and wash out his truck for the following day, and the defendant said that he had not been told that he could leave. If he had left at that time, the defendant asserted that he would have been fired.
Raymond Despanie, an employee of Angelle Concrete, was in the driver's lounge when the initial altercation broke out between the defendant and Mr. Rudd. Mr. Despanie testified that the defendant returned to the driver's lounge after two or three minutes. Mr. Despanie stated that the defendant, upon reentering the driver's lounge, said, "Pull your knife out on me now." When Mr. Rudd pulled out his knife, Mr. Despanie jumped between the defendant and Mr. Rudd. First, Mr. Despanie attempted to calm Mr. Rudd; but, when Mr. Rudd did not respond, Mr. Despanie turned to the defendant. The defendant willingly responded to Mr. Despanie, and the two men walked out of the driver's lounge. From outside the driver's lounge, Mr. Despanie attempted to keep Mr. Rudd inside and to calm Mr. Rudd once again. However, Mr. Rudd was still unresponsive to Mr. Despanie's attempts. Mr. Despanie testified:
A.... I put my hands up against the door to try to keep [Mr. Rudd] indoors, but he forced his way through, with the knife still in his hand, and he's waving the knife, telling me to get out of the way. And he was doing like this, swinging his arms, (demonstrating) "Get out of my way, Raymond." So II swerved (demonstrating) to get away from the knife, and he brushed past me.
Q. What happened then?
A. Well, the next thing I know, I heard a shot. I was in the process of swerving or turning back around, and I *1170 heard a shot, and saw Prudhomme's right arm extended, with a pistol in it.
Q. Now, was that the first time you had seen the gun?
A. Yes.
. . . .
Q. And what occurred at that point?
A. At that point, I saw Robert [Rudd] grab his torso, and he went down, and Prudhomme walked back into the driver's lounge and placed the pistol on the table, and he came back outside, and myself and Mike Richards, we were trying to assist Robert Rudd and Prudhomme also.
Michael Morrison, an employee of Angelle Concrete, was also in the driver's lounge when the altercation between the defendant and Mr. Rudd began. Mr. Morrison testified that he did not recall the defendant saying anything immediately upon reentering the driver's lounge. But, Mr. Morrison stated that Mr. Rudd was taunting the defendant when the defendant reentered, and Mr. Morrison never saw the defendant with a gun inside of the driver's lounge.
Anthony Thornton was also an employee of Angelle Concrete. Mr. Thornton was walking toward the driver's lounge when the altercation began. After Mr. Thornton briefly spoke to the defendant just outside of the driver's lounge, Mr. Thornton went inside. Mr. Thornton testified that he did not recall hearing the defendant say anything when the defendant reentered the driver's lounge. However, Mr. Thornton stated that Mr. Rudd went on "like a light switch" and yelled "I'm not afraid of that gun." Thornton additionally testified, "[Mr. Rudd] was out forI mean, he wanted Terrance.... He was going outside. He didn't care who was in front of that door. We would probably have had to park a truck in front of it to keep him in there." Mr. Thornton was also questioned about his impression of the defendant's intentions when the defendant returned, and Mr. Thornton answered:
Well, if [the defendant] intended on killing Robert [Rudd], I believe he would have walked in there with a gun and shot him. I don't believe his intentions were to kill Robert. I believe his intentions were to make Robert back down. That's myyou know, that's my impression of the whole thing. It was kind of aexcuse the expression. It was kind of a pissing contest. Robert had a knife, he made Prudhomme back down, you know. The next thing I know, Prudhomme's back, and I guess it was Rob's turn to back down, because Rob sure as heck knew he had a gun before I did.
David Andrus, an employee of Angelle Concrete, was sitting with Mr. Despanie when the altercation broke out. Mr. Andrus testified that he did not hear the defendant say anything when he returned. Further, Mr. Andrus stated that he did not see the gun until after the shooting.
David Goodly, a cement driver with Angelle Concrete, was in the work yard washing out his truck when these events occurred. Mr. Goodly testified that he heard the initial confrontation coming from the driver's lounge. Then, Mr. Goodly stated that he saw the defendant leave the break room, walk to his car, and return to the driver's lounge. Mr. Goodly subsequently walked a short distance to the office building. While in the office building, Mr. Goodly heard another altercation. Mr. Goodly stated that he watched Mr. Despanie push the defendant out of the driver's lounge door and attempted to hold the door of the driver's lounge closed. Mr. Goodly testified:
A. Well, when Robert [Rudd] busted out the door, and he was like swinging a knife, and Raymond ducked out of the way, for him not to get cut, I guess, andthat's when he kept walking *1171 towards Terrance, you know, "I'm not afraid to die," you know. "What you going to do with that gun? I'm not afraid to die." And that's when Terrance showed him the gun, and just kept walking up towards him.
. . . .
Q.... What was Robert Rudd's dominant emotion that he portrayed to you?
A. He just kept walking toward him with the knife open, you know, and
Q. Would you say that he was in a rage?
A. Yeah, pretty much a rage.
Q. From your vantage point, did you see retreat at that point by Terrance Prudhomme as a viable option for him?
A. Pretty much. Yes I did. He just kept backing up and saying, "Man, won't you leave me alone. Leave me alone." He just kept walking towards him.
Mr. Goodly also testified that he had witnessed a previous altercation between the defendant and Mr. Rudd. Specifically, Mr. Goodly stated that Mr. Rudd had previously attempted to cut the defendant with a knife slicing the defendant's jacket across the chest. In addition, Mr. Goodly said that the defendant responded by stating that, if Mr. Rudd pulled a knife on him again, the defendant was going to kill Mr. Rudd.
Michael Richards, a driver for Angelle Concrete, did not witness the altercation between the defendant and Mr. Rudd. However. Mr. Richards stated that he arrived upon the scene just after the defendant fired the shot. Mr. Richards testified that he heard the defendant repeatedly state that, "He shouldn't have pulled it out."
Franklin Fondel, a detective with the Lake Charles City Police Department,[1] was the first officer on the scene following the shooting, and he found Mr. Rudd on the ground with several Angelle Concrete employees standing over him. Detective Fondel testified that the defendant immediately identified himself as the shooter. As a result, Detective Fondel Mirandized the defendant and transported him to police headquarters.
Once at police headquarters, the defendant was interviewed by Detective Byron Lawson. This interview was videotaped, and the video tape was introduced into evidence at trial. Detective Lawson also testified as to the defendant's interview and the statements of witnesses, noting that when the defendant returned to the driver's lounge he told Mr. Rudd, "Now pull your knife out."
Doctor Terry Welke, coroner for Calcasieu Parish, testified that Mr. Rudd died as a result of a single gun shot wound to the torso from a distance of approximately three feet from the end of the barrel of the gun.
After the State rested, the defendant only called Michael Robinson in addition to his own testimony in support of his claim of self-defense. Mr. Robinson testified about a prior event where Mr. Rudd threatened Mr. Robinson with a knife. However, on cross-examination, Mr. Robinson stated that he simply walked away to end the confrontation.
On August 10, 2000, a grand jury indicted the defendant for second degree murder, a violation of La.R.S. 14:30.1. Although the defendant claimed that he shot Mr. Rudd in self defense, the jury found the defendant guilty of the responsive verdict of manslaughter on May 3, 2001. *1172 Thereafter, the trial court sentenced the defendant to twenty years at hard labor. Notably, the defendant did not file a motion to reconsider the sentence. The defendant now appeals his conviction and sentence raising the following assignments of error:
I. There is insufficient evidence to sustain the conviction of manslaughter[;]
II. The Honorable Trial Court erred in denying Appellant's request for a mistrial based on the admission of inadmissible other crimes evidence[; and,]
III. The twenty (20) year hard labor sentence imposed upon Appellant in this case is excessive.

Discussion

Errors Patent
Pursuant to La.Code Crim.P. art. 920, we have reviewed this matter for errors patent on the face of record and find no such errors.
Sufficiency of the Evidence
As his first assignment of error, the defendant contends that the State failed to prove beyond a reasonable doubt that the defendant did not reasonably believe that he was in imminent danger of losing his life or receiving great bodily harm and that his actions were not necessary. The defendant asserts that all witnesses to the incident characterized Mr. Rudd as the aggressor at all times and notes the testimony concerning Mr. Rudd's prior violent acts. Thus, the defendant asserts that the State failed to prove beyond a reasonable doubt that he was not acting in self-defense when he shot Mr. Rudd; and, in turn, he argues that the evidence is insufficient to support a manslaughter conviction. We find that this assignment lacks merit.
When examining an assignment of error concerning the sufficiency of evidence, the appellate court determines whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt while viewing the evidence in the light most favorable to the State. State v. Deal, 00-0434 (La.11/28/01); 802 So.2d 1254 (citing Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Further, a panel of this court articulated the following standard for reviewing the evidence:
A determination of the weight of evidence presented is a question of fact. The resolution of a matter where conflicting testimony exists requires a determination of credibility of the witnesses and is a matter of weight of the evidence and not sufficiency. Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. State v. Nolan, 503 So.2d 1186 (La.App. 3 Cir.), writ denied, 507 So.2d 226 (La. 1987).
A fact-finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Jackson, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. Where rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all evidence most favorable to the prosecution must be adopted on review. Only irrational decisions to convict by the trier of fact will be overturned. See State v. Mussall, 523 So.2d 1305 (La.1988).
State v. Taylor, 96-1043, p. 5 (La.App. 3 Cir. 2/5/97); 688 So.2d 1262, 1267.
La.R.S. 14:31 provides, in part:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree *1173 murder) or Article 30.1 (second degree murder), but the offense is committed in sudden heat of passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that the average person's blood would have cooled, at the time the offense was committed [.][2]
On the other hand, a homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La.R.S. 14:20(1). Thus, a trier of fact must examine the following to make a determination on a claim of self-defense: (1) whether the defendant reasonably believed that his life was in imminent danger; and, (2) whether deadly force was necessary to prevent the danger. State v. Addison, 97-1186 (La. App. 3 Cir. 3/6/98); 717 So.2d 648, writ denied, 98-0938 (La.9/4/98); 723 So.2d 955. A defendant does not have an unqualified duty to retreat from an altercation. Id. "However, the possibility of escape is a recognized factor in determining whether or not a defendant reasonably believed deadly force was necessary to avoid the danger." Id. at p. 9; 717 So.2d at 652.
The State will bear the burden at trial of proving beyond a reasonable doubt each element of the crime necessary to constitute the defendant's guilt. La.R.S. 15:271. Further, when a defendant asserts self-defense in a homicide prosecution, the State will also bear the burden of proving beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Hardy, 97-1248 (La. App. 3 Cir. 3/6/98); 711 So.2d 715, writ denied, 98-0927 (La.9/4/98); 723 So.2d 954. To successfully meet this burden, the State must "exclude every reasonable hypothesis of justification by self-defense." Id. at p. 4; 711 So.2d at 717 (quoting State v, Makar, 578 So.2d 564 (La.App. 3 Cir. 1991)). Yet, La.R.S. 14:21 provides:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
Mr. Despanie testified that the defendant returned to the driver's lounge two or three minutes after the initial altercation and stated, "Pull your knife out on me now." As a result, a jury may have found that the defendant was the aggressor or brought on the difficulty in the second altercation. In turn, the jury could have reasonably rejected the defendant's claim of self-defense.
Nevertheless, even if the jury found that La.R.S. 14:21 did not preclude the defendant's self-defense claim, the jury could have found that deadly force was not necessary. As soon as the defendant left the driver's lounge, the initial altercation had ended, and the defendant was not threatened by any danger. While the defendant asserted that he could not leave the work yard or he would be fired, he possessed several options on how to proceed. However, the defendant chose to walk to his car, conceal a gun on his person, and return to the driver's lounge. Since the defendant had several choices other than returning to the driver's lounge carrying a concealed weapon, it was reasonable for the jury to conclude that killing Mr. Rudd was not necessary to save *1174 the defendant's life. Moreover, Mr. Goodly testified that the defendant still had retreat as a viable option when the second altercation was carried outside of the driver's lounge, and Mr. Goodly testified that he ended his altercation with Mr. Rudd by simply walking away.
Therefore, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the State met its burden of proving beyond a reasonable doubt that the shooting of the victim was not committed in self-defense.

Mistrial
As his second assignment of error, the defendant argues that the State improperly introduced inadmissible other crimes evidence. In turn, he asserts that the trial court erred in not granting a mistrial because the question posed by the State destroyed his presumption of innocence, his right to a fair trial, and his right to a reliable determination of guilt or innocence. We find that this assignment lacks merit.
La.Code Crim.P. art. 770 provides, in part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
. . . .
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
. . . .
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
Interpreting La.Code Crim.P. art. 770, the Louisiana Supreme Court stated:
A mistrial is warranted under La. Code Crim.P. art. 770 when certain remarks are considered so prejudicial and potentially damaging to a defendant's rights that even jury admonition could not provide a cure. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94. Potentially damaging remarks include reference to race or religion, when not material or relevant to the case, and direct or indirect reference to another crime committed or alleged to be committed by the defendant, unless that evidence is otherwise admissible. La. Code.Crim.P. art. 770. The comment must be made within earshot of the jury and must be made by a judge, district attorney, or other court official. Id. Comments must be viewed in light of the context in which they are made. State v. Webb, 419 So.2d 436, 440 (La. 1982). Moreover, a comment must not "arguably" point to a prior crime; to trigger mandatory mistrial pursuant to Article 770(2), the remark must "unmistakably" point to evidence of another crime. State v. Babin, 336 So.2d 780 (La.1976)(where reference to a "mug shot" was not unmistakable reference to a crime committed by defendant); State v. Harris, 258 La. 720, 247 So.2d 847 (1971)(where no crime was evidenced by a police officer's reference to obtaining defendant's photograph from the Bureau of Investigation). In addition, the imputation must "unambiguously" point to defendant. State v. Edwards, 406 So.2d 1331, 1349 (La.1981), cert. denied sub nom. Edwards v. La., 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). The defendant has the burden of proving that a mistrial is warranted. See State v. May, 362 So.2d 516 (La.1978).
State v. Edwards, 97-1797, p. 19-20 (La.7/2/99); 750 So.2d 893, 906, cert. denied *1175 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999).
At trial, the State inquired as to a restraining order the defendant's wife had applied for, and the defense objected to this line of questioning. The following exchange between the State and defense subsequently took place outside the hearing of the jury:
MS. VAN DYKE:
Your honor, he'sYour Honor, he's going to try and bring up character evidence, that we deliberately excluded and did not touch on. Now he's going to bring up some domestic restraining orders that have never been finalized. Therethere has been no adjudication on it. And he's going to bring that up to impeach my client's character. Now, I didn't ask him about his character trait, or peacefulness.
. . . .
THE COURT:
Well, I'll tell you right now, I'mMr. Frey, I'm not going to allow it, even if I don't know on what basis that could come in because it's notit's not regular impeachment testimony, from the standpoint of a conviction. And, to me, in something like this, the prejudicial effect of itnow, this is something between him and his wife?
MS. VAN DYKE:
Yes.
MR. FREY:
Yes, sir.
THE COURT:
I think the prejudicial effect, I think it would outweigh any probative value it has, because it has nothing to do with workplace violence.
After this exchange, the State asked the defendant the following question in the presence of the jury: "Q. Was the reason for your separation, did it have anything to do with you committing acts of violence against your wife?" Defense counsel immediately objected, and the defendant did not answer. The trial court sustained the objection and admonished the jury to disregard the question.
Once the presentation of evidence was closed, the defendant moved for a mistrial out of the presence of the jury. The trial court denied the motion for a mistrial and provided the following oral reasons for ruling:
Well, a mistrial is denied. Look, this happens often. I will say, it doesn't happen this way, and ... Mr. Frey, I've considered you a very high professional, and you are, and I think you know better than to have asked that question, after the ruling I made. But, I've told the Jury to disregard the question. There was no answer. The defendant also mentioned that the case was dismissed. And nothing's been established, and we ... tell jurors to disregard stuff often. We can't go over everything when ... things happen like that. You know, I ... told them right at the beginning, I told them to disregard the question and all I can do is to expect
. . . .
that they'll follow my instruction. I told them right then and there.
After review of the remarks, in light of the Louisiana Supreme Court's discussion in Edwards, 97-1797; 750 So.2d 893, we find no error in the determination that the remarks were not necessarily violative of La.Code Crim.P. art. 770. We note that, even if we were to conclude that the prosecutor's remarks constituted error, as urged by the defendant, this type of trial error is subject to the harmless error review. See State v. Johnson, 94-1379 (La.11/27/95); 664 So.2d 94. In Johnson, the Louisiana Supreme Court explained: "[E]rroneous introduction of other crimes' evidence is a trial error, i.e., an error which occurs during the case's presentation *1176 to the trier of fact, which may be quantitatively assessed in the context of the other evidence. As such, it may be reviewed for harmless error." Id. at p. 15; 664 So.2d at 101. Quoting the United States Supreme Court in Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993), the supreme court further explained that the harmless error inquiry: "[I]s not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Id. at p. 14; 664 So.2d at 100.
In State v. McBride, 00-0422 (La.App. 3 Cir. 11/15/00); 773 So.2d 849, writ denied, 01-0294 (La.2/8/02); 807 So.2d 858, a panel of this court held that the trial court's denial of a mistrial after the State asked a question referring to other crimes evidence constituted harmless error. The court stated:
Defendant never answered the State's question, and the trial court prevented the State from pursuing the matter. Thus, the single question is unlikely to have influenced the jury, particularly in light of the fact that Defendant conceded he cut the victim's throat and built his case on self-defense as justification. The State wanted to show that Defendant was still able to fight and, thus, not as debilitated as he wished to present himself. However, the record reveals Defendant was able to ride a horse and help other men work cattle. Further, the evidence showed that Defendant still had sufficient dexterity to open a folding knife with one hand while on horseback and then cut another man's throat with it. In light of Johnson, 664 So.2d 94, we find that the State's overall case against Defendant was strong enough such that any error committed by the State in this instance was harmless.
Id. at p. 22; 773 So.2d at 862-63.
Similarly, the defendant in this case was asked a single question that he did not answer. Defense counsel's objection to the question was sustained, and the jury was immediately admonished. In addition, the defendant admitted that he walked away from the initial altercation, went to his car, concealed a gun on his person, and returned to the driver's lounge. Mr. Despanie also testified that the defendant, upon reentering the driver's lounge, said, "Pull your knife out on me now."
Therefore, the State's overall case against the defendant was sufficiently strong that any error committed by the State in this case was harmless.
Excessive Sentence
For his final assignment of error, the defendant contends that the sentence of twenty years at hard labor was constitutionally excessive under the facts and circumstances of the case. The defendant asserts that the trial court failed to adequately consider the following mitigating factors: (1) The defendant has no prior criminal history; (2) the defendant has continuously provided for his family; (3) Mr. Rudd was armed with a knife; and, (4) Mr. Rudd was the initial aggressor.
As noted above, the defendant did not file a motion to reconsider sentence. As a result, failure to make or file such a motion will generally preclude a defendant from objecting to the sentence on appeal. La. Code Crim.P. art. 881.1. However, the defendant argues that trial counsel's failure to make or file such a motion resulted in the waiver of his right to object on specific grounds to the sentence imposed. In turn, the defendant alleges that he was denied the effective assistance of counsel at sentencing.
*1177 Failure to file a motion to reconsider the sentence does not necessarily constitute ineffective assistance of counsel. State v. Texada, 98-1647 (La.App. 3 Cir. 5/5/99); 734 So.2d 854. Nevertheless, the defendant may have a basis to claim ineffective assistance of counsel when the he can show a reasonable probability, but for defense counsel's error, his sentence would have been different. Id. Furthermore, in State v. Francis, 99-208 (La.App. 3 Cir. 10/6/99); 748 So.2d 484, writ denied, 00-0544 (La.11/13/00); 773 So.2d 156, this court stated:
A claim of ineffective assistance of counsel is properly raised in an application for post conviction relief. This allows the trial judge an opportunity to order a full evidentiary hearing on the matter. State v. Burkhalter, 428 So.2d 449 (La.1983). However, where the record contains evidence sufficient to decide the issue and the issue is raised by an assignment of error on appeal, it may be considered. State v. James, 95-962 (La. App. 3 Cir. 2/14/96); 670 So.2d 461.
Id. at p. 10-11; 748 So.2d at 491. Since we find that the record contains sufficient evidence to address this ineffective assistance of counsel issue, we will determine whether there was a reasonable probability that the defendant's sentence would have been reduced had defense counsel made or filed a motion to consider his sentence.
The defendant was convicted of manslaughter, a violation of La. R.S. 14:31, which provides a term of imprisonment of not more that forty years at hard labor. Thereafter, the defendant was sentenced pursuant to La.Code Crim.P. art. 893.3(E)(1), which provides, in part:
(a) Notwithstanding any other provision of law to the contrary, if the defendant commits a felony with a firearm as provided for in this Article, and the crime is considered a violent felony as defined in this Paragraph, the court shall impose a minimum term of imprisonment of ten years. In addition, if the firearm is discharged during the commission of such a violent felony, the court shall impose a minimum term of imprisonment of twenty years.

(b) A "violent felony" for the purposes of this Paragraph is: ... manslaughter....
(Emphasis added.)
At the sentencing hearing, the trial court found by clear and convincing evidence that the defendant discharged a firearm while committing a violent felony. Consequently, the trial court sentenced the defendant to the mandatory minimum prison term of twenty years.
A mandatory minimum sentence may be excessive if the sentence makes no measurable contribution to acceptable goals of punishment and amounts to the purposeful imposition of pain and suffering and is grossly disproportionate to the crime. State v. Dorthey, 623 So.2d 1276 (La.1993). On the other hand, a mandatory minimum sentence is presumed to be constitutional. State v. Johnson, 97-1906 (La.3/4/98); 709 So.2d 672. To rebut this presumption, the defendant must carry the burden to show that he is exceptional. Id. Specifically, the defendant must show that, due to unusual circumstances, he is "a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances of the case." Id. at p. 8; 709 So.2d at 676 (quoting State v. Young, 94-1636, pp. 5-6 (La.App. 4 Cir. 10/26/95); 663 So.2d 525, 528, writ denied, 95-3010 (La.3/22/96); 669 So.2d 1223).
The defendant argues that the circumstances of the instant case were unusual because Mr. Rudd initiated the confrontation and threatened him with a knife. As *1178 a result, the defendant argues that his criminal conduct is unlikely to recur under these circumstances. The defendant additionally points to the testimony of one of the jurors, Tammy Burk, at the sentencing hearing. Ms. Burk testified that the jury would have preferred a lesser verdict than manslaughter and stated that she considered a sentence of twenty years to be excessive under the facts and circumstances of the case. For these reasons, the defendant asserts that his sentence is the purposeless and needless imposition of pain and suffering and is grossly disproportionate to the severity of the crime.
At the sentencing hearing, defense counsel argued that La.Code Crim.P. art. 893.3(H) was applicable in the instant case. Article 893.3(H) provides:
If the court finds that a sentence imposed under provisions of this Article would be excessive, the court shall state for the record the reasons for such finding and shall impose the most severe sentence which is not excessive.
However, the record of the sentencing hearing indicates that the trial court considered whether the mandatory minimum sentence of twenty years was excessive and took great care to assess the circumstances of the case before imposing the sentence. The trial court noted each letter submitted regarding the defendant's sentence and named the sender of each letter. The trial court also stated that it had considered the sentencing guidelines as required by La.Code Crim.P. art. 894.1 and La.Code Crim.P. art. 893.3. In addition, the trial court observed that the defendant was a first time felony offender and discussed how a mandatory minimum sentence could be excessive under certain circumstances. Although the jury rejected the defendant's justification defense, the trial court considered Mr. Rudd's actions a mitigating factor. The trial court stated:
So, there was a lot of provocation, ... but there was also the fact that Mr. Prudhommeand it's inescapable that, by your own testimony, that all that occurred initially, and then you walked out a long distance to your car, and for whatever reasonthere werethere was notit just there was no testimony by you as to why you came back in there, but there was no good reason for you to come back to that shack.
After citing State v. Harris, 97-300 (La.4/14/98); 711 So.2d 266,[3] the trial court concluded:
[S]o, Mr. Prudhomme, the problem for you on this case is what the legislature has done and said about guns, and about having them, and about using them, and they've put greater penalties on them because of that. And that results in taking the discretion away from the Court as to what it would do on the sentencing, because the legislature, as a matter of policy, has said thatthey've said that, unless I findunless I find the 20 years excessive, they're saying that they're mandating a 2320 year sentence. And I'm unable to conclude that thethat the sentence as mandated by theby the legislature meets the standardsmeets the level of excessive for this offense under the circumstances present here.
When imposing a sentence that is suited to a defendant, the trial court is required to look to the circumstances of the case and the defendant's background. Dorthey, 623 So.2d 1276. Yet, when reviewing the trial court's determination of sentence, the appellate court will examine whether the trial court abused its discretion, not whether another sentence is more *1179 appropriate. State v. Cook, 95-2784 (La.5/31/96); 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
Due to the careful consideration given the circumstances of the instant case before imposing the defendant's sentence, the trial court did not abuse its discretion when it sentenced the defendant to the mandatory minimum sentence of twenty years at hard labor on the conviction of manslaughter. Further, in light of the trial court's thorough examination, we find it unlikely that the trial court would have reduced the defendant's sentence had defense counsel made a timely objection to the sentence. Therefore, the defendant failed to show a reasonable probability that, but for counsel's error, his sentence would have been different had defense counsel made a timely objection to the sentence.

DECREE
The conviction and sentence of the defendant, Terrance P. Prudhomme, are affirmed.
AFFIRMED.
NOTES
[1] At the time of the incident, Detective Fondel was a patrolman. Detective Fondel had been promoted to the position of detective prior to trial.
[2] We note that the jury was only instructed on this portion of La.R.S. 14:31.
[3] In State v. Harris, 97-300 (La.4/4/98); 711 So.2d 266, the Louisiana Supreme Court held that, despite the defendant's claim of self-defense, the trial court's imposition of a seventeen year sentence for a conviction of manslaughter was not constitutionally excessive.