STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

13-424

STATE OF LOUISIANA

VERSUS

JESSIE JAMES DUPLANTIS

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 53049
HONORABLE EDWARD B. BROUSSARD, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of  Jimmie C. Peters, Elizabeth A. Pickett, and J. David Painter, Judges.

PETERS, J., dissents and assigns written reasons.

AFFIRMED .  REMANDED WITH INSTRUCTIONS.

Michael Harson
District Attorney, Fifteenth Judicial District
Ted L. Ayo
Assistant District Attorney
100 North State St.
Abbeville, LA
(337) 898-4320
COUNSEL FOR PLAINTIFF/APPELLEE:
    State of Louisiana

Carey J. Ellis, III
Louisiana Appellate Project
P. O. Box 719
Rayville, LA 71269
(318) 728-2043
COUNSEL FOR DEFENDANT/APPELLANT:
    Jessie James Duplantis

**Jessie James Duplantis**
**Louisiana State Penitentiary**
**Hickory - Unit 2**
**Angola, LA 70712**
**PRO SE**

**PICKETT, Judge.**

## FACTS

H.C. [1] was referred for counseling with Rachel Hinton, a licensed professional counselor and licensed marriage and family therapist.[2] H.C. indicated to Ms. Hinton he had been inappropriately touched by his brother and one time by the defendant, his mother's boyfriend. Ms. Hinton stopped the questioning and notified H.C.'s Office of Child Services (OCS) worker.

Nicholette Joseph testified at trial as the representative of Hearts of Hope, a children's advocacy center. She interviewed H.C. on June 2, 2010, when H.C. was six years old. The state played the videotaped interview to the jury over the defendant's objection. On the video, H.C. said he could not live with his mom because she had a boyfriend, Jessie James Duplantis, the defendant, who did "mean things." H.C. first said the defendant touched his private four times, and his brother Blake touched him four times. He said the first time the defendant touched him, he was four years old; the last three times, he was three. H.C. first said the defendant touched him "all over on the private," keeping his hand still. Then he said the defendant touched his private with a paddle with H.C.'s clothes on and again with his hand with H.C.'s clothes off.

After H.C. made those comments, he asked to "start all over." He pointed to where he said the defendant touched him, and this time, he said the defendant moved his hand. Ms. Joseph presented H.C. with a forensic drawing of what H.C. described as a boy with no clothes. Ms. Joseph told H.C. the boy had no clothes on

_____

[1] The victim's initials are used to protect his identity in accordance with La.R.S. 46:1844(W).

[2] The record does not indicate the date of the counseling session.

because he just got out of the bathtub. H.C. circled the area where he said the defendant touched him, and he called it his "bird." He said the defendant touched his skin inside his clothes. His mother and brother were at home when this occurred. When asked what room of the trailer, where they lived, these acts occurred, H.C. answered only, "in the trailer."

When Ms. Joseph asked H.C. if he had told his mom, aunt, and granny about what happened, H.C. nodded and said "they got mad." He felt bad that he could no longer talk to the defendant. Toward the end of the interview, H.C. said he was in the bathtub when the defendant came in, touched his private, and "that was it."

H.C. also testified at trial after the trial judge questioned him about the difference between the truth and a lie. He was nine years old and in the fourth grade at the time of trial. H.C. used to live with his biological mother, Valerie Chauvin, and the defendant was her boyfriend. When H.C. looked around the courtroom twice, he testified he did not see the defendant. He then identified the defendant.

The defendant objected and asked for a mistrial. Apparently, someone in the audience made a comment defense counsel thought influenced H.C. Regarding H.C.'s identification of the defendant, the record states:

Q    Do you see Mr. Jessie in the courtroom? Look around.

A    I don't see.

Q    You looked all over? You need to stand up to look?

A    I don't see him.

Q    You don't see him?

A    No.

Q    You still don't see him anywhere?

2

A      Right there (indicating).

Q      Okay. Where are you pointing? What color shirt does he have on?

A      White.

Q      Does he have a tie or does he not have a tie?

A      He does.

BY [the State's counsel]:  Let the record reflect that he's pointing to the defendant wearing a tie.

BY [Defendant's counsel]:  May we approach?

BY THE COURT:   All right.

(WHEREUPON, THE FOLLOWING WAS TAKEN AT A SIDEBAR OUT OF THE HEARING OF THE JURY.)

BY [Defendant's counsel]:  I need it reflected for the record that I wanted to do this out of the presence of the jury because I didn't want to point it out any further to them, but the child only pointed out the defendant after he stood up and after at least one of the ladies, who's directly behind me – and although I almost always have tunnel vision for these kind of things – even I could hear her say where he was sitting and what he was wearing.

BY THE COURT: I could hear something, but I couldn't tell what was said.

BY [the State's counsel]:  I didn't see it; I'm sorry.

BY [Defendant's counsel]: I could hear it and that's unusual for me.

BY THE COURT: I think Autumn might have heard it, too, because her eyes got real big after the lady made a remark.

BY [the State's counsel]: You want me to ask her to come up?

BY THE COURT : You want her to come over?

BY [Defendant's counsel]: Well, I think the damage is done now. So I think I have no choice but to ask for a mistrial.

BY THE COURT: It would be whether the boy heard her, though.

3

On further questioning, H.C. commented "he thought [the defendant] was going to be in handcuffs and his handcuffs the legs, too. [sic] But he was kind of sad that – it wasn't a dream, no." When asked if he heard anyone in the room tell him where the defendant was situated in the courtroom, he replied the state's counsel had told him "to look better and then I didn't see him. Then I looked, then I saw."

H.C. testified the defendant stayed at the trailer with him and his mother "[sometimes]." When asked whether the defendant ever stayed at the trailer with H.C. by himself, H.C. responded, "I guess." H.C. testified the defendant "did something that he wasn't supposed to do . . . He did something wrong and then he got in trouble . . . Touched something that he wasn't supposed to . . . The private." They were in the bathroom; H.C. "was taking a bath and [defendant] just – he just did it on purpose." H.C. did not need help cleaning his "private." This happened "[l]ike maybe once – one time." H.C. did not recall if he had ever told anyone it happened more than once.

The defendant's girlfriend, H.C.'s natural mother, was Valerie Chauvin. Valerie's brother and his wife, also named Valerie, adopted H.C. in 2011.[3] H.C. referred to the women as his "old mom" and his "new mom." His new mom told him to "[j]ust tell the truth and don't lie" about the touching incident.

The trailer where H.C. lived was in the same yard as his grandmother, "Granny Betty." His older brother, Blake, also lived in the trailer; H.C. said Blake was thirteen. H.C. sometimes took baths at Granny Betty's house. H.C. testified his memories were "kind of old and fuzzy." He further testified that he did not have a conversation with his brother, Blake, about the incident. On cross-

---

[3]H.C.'s adoptive father testified the adoption occurred in October of 2009.

examination he stated he did not remember a conversation with Blake, then stated he had no conversation about his testimony with his older brother. During follow-up with the state's attorney, H.C. said it was true that the defendant touched his private, his mom and dad just told him to tell the truth, and he was telling the truth then.

Keith Bedwell, the defendant's probation officer, testified he had supervised the defendant after he pled guilty to two counts of indecent behavior with a juvenile on April 3, 2006. One of the charges dealt with behavior in 1996. Mr. Bedwell also testified the defendant pled guilty on November 2, 1992 to carnal knowledge of a juvenile. He believed the defendant lived in a trailer in Abbeville with his wife, Valerie, at the time of the probation supervision. One of the rules of the defendant's probation was to have no contact with juveniles; no juveniles could visit or come inside "the place that he was registered as a sex offender." The trial judge instructed the jury to consider that information only for the limited purpose of whether it tended to show a lustful disposition toward children.

The defendant's wife, Valerie, testified at trial.[4] The couple was married on June 18, 2010. Valerie lived in a FEMA camper in 2007 and 2008. The defendant lived with his mother in 2006, with Terry Bessard in 2007, and with Valerie's parents in their home from January 8, 2008 to March 3, 2008. She said the defendant never lived with her at her parents' home because of the orders of the defendant's probation officer. Valerie understood the defendant was not to live with H.C. She testified the defendant spent time with Valerie's children only "[w]ith other adult supervision," and he was never alone with H.C. She further

_____

[4]Valerie Chauvin was charged as a principal to the defendant's offense and was advised of her right to avoid self-incrimination prior to her testimony.

testified that she bathed H.C. at her parents' home because their FEMA trailer had no hot water.

Although Valerie knew about the defendant's first conviction, she did not consider him to be a sex offender until "[a]fter his second charge." H.C. was taken from Valerie's care because someone reported to OCS the defendant had babysat him; Valerie testified the defendant "did not babysit [her] children."

Blake Bourque, H.C.'s half-brother, was fifteen at the time of trial. Blake testified he lived with H.C. "[f]rom the day [H.C.] was born to 2007," and the defendant lived with Blake's grandparents. To Blake's knowledge, the defendant was never alone with H.C. The defendant started coming around in 2007, after H.C.'s dad died on August 17, 2007.

Blake testified that at a get-together at his great-grandmother's home earlier in the year, H.C. pulled Blake aside and said he wanted to talk to him. Blake said H.C. was about to cry, and he told Blake "he had been lying . . . about the whole situation about [the defendant] touching him." H.C. said his uncle had really done it.[5] Blake testified he asked H.C. if he had talked to his adoptive parents about it. H.C. said he had, and "[t]hey didn't say nothing."

Frank Duplantis, the defendant's brother, testified he saw the defendant "[p]retty much everyday" in 2007 and 2008 while the defendant was staying with their mother. He said the defendant was not staying in the FEMA camper with Valerie. Frank said he never saw Valerie's children at his mother's house. He believed he would know if the defendant had been alone with the children, and he had not been to Frank's knowledge. On cross-examination, Frank testified he was

---

[5]Blake identified the uncle by name at trial; it was not H.C.'s uncle Ralph, who is also his adoptive father.

"[n]ot a hundred percent" sure the defendant had not been alone with the children, but he was "pretty sure he wasn't."

Timothy Duplantis, also the defendant's brother, testified the defendant had "just got out of jail" in 2007 and 2008. He first lived with their mother and then "rented a little apartment" in town. The defendant returned to his mother's house, then moved to Bessard's house. He never lived with Valerie during that time, and he was not alone with Valerie's children. Several other witnesses, including Valerie's father and the defendant's mother, also testified other adults did not live in Valerie's home, and the defendant was not alone with Valerie's children.

Valerie Chauvin, H.C.'s adoptive mother, testified H.C. "[n]ever, never" told her his uncle, and not the defendant, touched him. H.C. never said he had a conversation with Blake on this topic. Ralph Chauvin, H.C.'s adoptive father, testified the same.

The defendant was indicted on September 14, 2010, for the sexual battery of H.C. in violation of La.R.S. 14:43.1. The indictment was amended on January 14, 2011, to allege the offense occurred between November 2007 and January 2008. A jury rendered an eleven-to-one verdict and found the defendant guilty as charged on September 12, 2012. The trial court sentenced the defendant to life imprisonment, with the first twenty-five years without benefit of parole, probation, or suspension of sentence. The defendant now appeals his conviction and sentence.

## ASSIGNMENTS OF ERROR

1. The State failed to present sufficient evidence to support the verdict, a conviction of sexual battery.

2. The admission of evidence of convictions of other crimes was error in this case.

7

3. It was error for the Trial Court to allow a recorded interview of the minor child the subject of this proceeding to be introduced over objection when the recorded interview was not provided to the Defense prior to trial during discovery.

4. The verdict of the jury in this case is unconstitutional since it was not unanimous.

5. The sentence of life imprisonment is unconstitutionally excessive.

*Pro Se* Assignments of Error:

1. Petitioner contends that the indictment was not brought in open court by the grand jury which is a violation of his fourteenth amendment of the United States Constitution as well as Article 1 Section 2 of the Louisiana Constitution of 1974, and all relevant statutes thereof.

2. The trial judge erred in denying a mistrial over the defense counsel objection on the reference during the opening statement by the State to the convictions of the defendant.

3. The trial judge erred in allowing the state to introduce three DVD's video's [sic] over the defense counsel['s] two objections.[ ]

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there is one error patent.

The record does not indicate that the trial court advised the defendant of the prescriptive period for filing an application for post-conviction relief as required by La.Code Crim.P. art. 930.8. The trial court is directed to inform the defendant of the provisions of article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received the notice. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

## SUFFICIENCY OF THE EVIDENCE

The defendant argues the evidence presented was insufficient to support the verdict. He contends the other witnesses who testified the crime occurred all obtained their information from H.C., who was only four years old at the time the offense allegedly occurred and nearly six when he made the accusations during the Hearts of Hope interview.

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at

9

1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. ___, ___, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378.

In this instance, "[s]exual battery is the intentional . . . touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender" when the victim "has not yet attained fifteen years of age and is at least three years younger than the offender[.]" La.R.S. 14:43.1(A)(1).[6] The state's case was based on the alleged event where the defendant touched H.C. inappropriately while H.C. was in the bathtub.

"[T]he testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even if there is no physical evidence." *State v. Simon*, 10-1111, p. 7 (La.App. 3 Cir. 4/13/11), 62 So.3d 318, 323 *writ denied,* 11-1008 (La. 11/4/11), 75 So.3d 922 (citing *State v. Leyva–Martinez,* 07-1255

---

[6]This language reflects the 2007 version of the statute.

(La.App. 3 Cir. 4/30/08), 981 So.2d 276, *writ denied,* 08-1200 (La. 1/30/09), 999 So.2d 747). In *Simon*, the advocacy center video showed the victim said the defendant touched her inappropriately, and she used a diagram to circle the body part he allegedly touched. She also recounted the events in her trial testimony. This court upheld the defendant's conviction, noting "[t]he jury heard all testimony in this matter and obviously found [the victim]'s version of the events credible. That credibility determination should not be second-guessed by this court." *Id.*

In *State v. Cavazos*, 11-733 (La.App. 4 Cir. 5/16/12), 94 So.3d 870, *writ denied,* 12-1372 (La. 10/26/12), 99 So.3d 645, *and writ denied*, 12-1438 (La. 10/26/12), 99 So.3d 645, the defendant was convicted of sexual battery and failure to register as a sex offender. The victim was his girlfriend's eight-year-old daughter. She testified the defendant touched her inappropriately on multiple occasions. She told her physician of the incidents, but she could not recall when they occurred during a forensic interview. A few days later, the victim told a child advocacy center physician the defendant had touched her and hurt her. The record contained no evidence to refute her claim. The fourth circuit held the evidence was sufficient to support the conviction.

In *State in Interest of R.A.*, 11-440 (La.App. 4 Cir. 11/2/11), 101 So.3d 957, the victim testified the juvenile defendant, her cousin, committed sexual battery on her when she was seven or eight years old. She was thirteen at the time of the adjudication hearing. An advocacy center representative testified the victim indicated the juvenile had touched her inappropriately and committed other inappropriate acts while they were at the homes of the victim's relatives. A statutorily compliant video, however, was not submitted into evidence. The

11

victim's trial testimony was inconsistent about her age at the time of the incidents, and she could not pinpoint dates on which they occurred.

The victim's aunts testified the victim and the juvenile were at their homes on multiple occasions, but the children were never alone. They did not have access to the upstairs bedrooms, which were kept locked. The juvenile's door was never closed, and the adults constantly checked on the children in his room.

On appeal, the fourth circuit found it was "very close as to whether, viewed in the light most favorable to the prosecution, the evidence is sufficient to convince a rational trier of fact that the juvenile committed the offense charged." *Id.* at 963. Nevertheless, the fourth circuit recognized it could not "substitute [its] opinion for that of the juvenile court judge who was in the unique position to see the witness testify" and determine whether she did in fact identify a body part that was inappropriate for the juvenile to touch. *Id.* The appellate court affirmed the juvenile's adjudication.

Here, the jury obviously believed H.C.'s testimony. It had the opportunity to assess H.C.'s credibility and the credibility of his brother, his mother, and the other witnesses. It concluded the defendant was guilty as charged. The defendant argues H.C.'s testimony is inconsistent with the statement he gave in the interview he gave at Hearts of Hope. We have reviewed both the video statement and the victim's court testimony. We find these statements, when taken as a whole, are consistent enough for a reasonable finder of fact to find his testimony credible. The jury believed H.C.'s testimony regarding the offense. Applying the *Jackson* standard of review we find there is sufficient evidence to support the jury's finding of guilt.

12

## OTHER CRIMES EVIDENCE

The defendant contends the trial court erred by admitting evidence of his prior convictions for other crimes. He believes the only way the jury was convinced of his guilt was through evidence of the prior convictions.

Louisiana Code of Evidence Article 412.2(A) allows such evidence in order to "indicate a lustful disposition toward children" when the defendant "is charged with a crime . . . involving a victim who was under the age of seventeen at the time of the offense[.]" The evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" La.Code Evid. art. 403. While the defendant objected to the admissibility of the evidence at trial, he did not make any objection regarding the failure to conduct the balancing test of article 403, as he does on appeal.

The trial court allowed evidence of the defendant's guilty pleas to two counts of indecent behavior with a juvenile, made in 2006. The factual basis of the plea in one count was that the defendant "engaged in the commission of any lewd or lascivious act upon the person or in the presence of a child whose date of birth was 9/1 of 1985 where there was an age difference of greater than two years[.]" The factual basis in the second count was that, "during the year 1996, [the defendant] engaged in a lewd or lascivious act with a child whose date of birth was September 1, 1985, when there was an age difference of greater than two years[.]" The pleas showed the defendant's date of birth was February 4, 1970.

The trial court also allowed evidence of another guilty plea on November 2, 1992. This conviction was for carnal knowledge of a juvenile. The factual basis of the plea was "that between January 1 and December 25, 1989, [Defendant] did have sexual intercourse with a female, date of birth January 17, 1978, when he was

13

beyond the age of seventeen (17) years with an age difference of more than two (2) years between the parties."

In allowing the evidence, the trial court relied on *State v. Williams*, 11-876 (La.App. 5 Cir. 3/27/12), 91 So.3d 437, *writ denied*, 12-1013 (La. 9/21/12), 98 So.3d 334. In *Williams*, evidence of the defendant's prior conviction of carnal knowledge of a juvenile was allowed in his trial on the charge of molestation of a juvenile. The victim was a nine-year-old girl who alleged the defendant touched her inappropriately on top of her clothing. The victim in the prior conviction was a thirteen-year-old girl with whom the defendant had intercourse. The trial court found the cases were sufficiently similar for the evidence to be admissible under La.Code Evid. art. 412.2(A), and the passage of time since the prior conviction did not call for exclusion of the evidence. The fifth circuit affirmed the decision.

This court allowed evidence of other crimes in a case of an aggravated rape/aggravated battery of an adult in *State v. Archield*, 09-1116 (La.App. 3 Cir. 4/7/10), 34 So.3d 434, *writ denied*, 10-1146 (La. 5/20/11), 63 So.3d 972. The defendant was previously convicted of aggravated battery and molestation of a juvenile. The trial court allowed evidence of "three sexually assaultive acts, crimes, or wrongs" to show the defendant's intent in those instances to have sexual relations with victims without their consent. *Id.* at 445. At a hearing to determine admissibility of the evidence, the trial court determined the evidence was admissible under La.Code Evid. art. 412.2. Even though the evidence was prejudicial, it met the balancing test of the article. This court found other evidence corroborated the prior victims' testimony and confirmed the defendant's identity as the perpetrator. Considering the limiting instruction the trial court gave the jury

14

and the jury's acquittal of the defendant on a second aggravated rape charge, this court determined the jury was not confused or misled by the other crimes evidence.

The trial court here gave the jury a limiting instruction immediately after evidence of the prior convictions was admitted:

> Evidence that the defendant was involved in the commission of offenses other than the offense for which he is on trial is to be considered only for a limited purpose. The sole purpose for which such evidence may be considered is whether it tends to show a lustful disposition towards children. Remember the accused is on trial only for the offense charged. You may not find him guilty of his offense merely because he may have committed another offense.

The instructions given to the jury at the conclusion of the trial included the same language.

The evidence of prior crimes showed the defendant's lustful disposition toward children. This instance, showed the fourth time the defendant was involved in committing a sexual act on a child. Considering the trial court's limiting instruction, the trial court did not err in allowing evidence of the prior convictions.

### RECORDED INTERVIEW OF THE VICTIM

The defendant argues the trial court erred by allowing H.C.'s recorded interview to be introduced over objection when the recorded interview was not provided to the defense prior to trial during discovery. The defendant's *pro se* brief contends the trial judge erred by allowing not only the video of H.C.'s interview, but also a video of the defendant and a video of Valerie Chauvin, into evidence. The record shows all three videos were "placed with the Clerk of Court for safekeeping" to allow the custodial witness to return to his job while other testimony took place. Only the video of H.C. was introduced into evidence and shown to the jury. Thus, the defendant's argument applies only to that video.

15

Reginald Reed of the Vermilion Parish Sheriff's Department testified he received the three sealed DVD interviews from Sergeant James Gleason, including the video of H.C.'s interview at Hearts of Hope. Defense counsel objected, arguing she was never given that video. The trial court agreed counsel "should have been given" the video.

The state, however, argued defense counsel knew about the video because it was part of the open file discovery. The state's attorney told the trial court he had talked to defense counsel about the video the week of the trial, asked if her client had viewed it, and asked if she wanted to view it. The state said defense counsel "said no."

The defendant's counsel disagreed, however, contending she had "nagged [the state's counsel] repeatedly if they had any protected person video and was consistently told they did not have it." The state's counsel argued the open file discovery included "talk about the interview," and a witness told of conducting it. Additionally, the police report referred to the interview and the recording of it. Thus, the state's counsel contended defense counsel had notice of the need to file a motion to obtain the video. Nevertheless, correspondence dated February 15, 2011, referred to only two videos, those of the defendant and Valerie.

The trial judge found defense counsel had received discovery that included "referrals to the existence of that video." He allowed a recess during which defense counsel viewed the video. The trial judge cited La.R.S. 15:440.5, allowing the video to be admitted when the defendant has the opportunity to view it before it is offered into evidence. The video was then shown to the jury and introduced into evidence over the defendant's objection.

On appeal, the defendant contends "[t]he time to review and prepare for HC's DVD interview was so minimal that the fairness of this proceeding is highly questionable." However, the defendant never sought a continuance or a mistrial on grounds he was unable to adequately prepare for trial because counsel had not seen the video. He offers no indication of how he would have prepared differently for trial had he viewed the video earlier or how that supposed preparation would have affected the jury in his favor. He does not identify any particular prejudice that resulted from not viewing the videotape earlier. He simply contends it was unfair. Because the defendant has not shown any manner in which prejudice resulted or suggested how it may have influenced the verdict, any error concerning the introduction of the video into evidence is harmless.

## **NON-UNANIMOUS JURY VERDICT**

The defendant argues the non-unanimous jury verdict was unconstitutional. The jury convicted the defendant by an eleven-to-one verdict. The defendant acknowledges the present law requires ten jurors to concur in a verdict. Nevertheless, he urges this court to remand his case "for a new trial in which only a unanimous verdict will be accepted."

After closing arguments, the trial judge instructed the jury "[a]t least ten members of the jury must concur to reach a verdict in this case," as provided by La.Code Crim.P. art. 782. The defendant did not object to the jury instructions. In fact, prior to the reading of the instructions to the jury, the trial judge asked if both counsel were "good with the instructions[.]" The defendant's attorney responded, "[t]he defense is fine with them."

When the verdict was announced at trial, the defendant requested polling of the jury. The record indicates that was done, the jury was dismissed, and the trial

judge ordered a pre-sentence investigation and denied the defendant's request to set bond. The defendant never raised any objection to the verdict or contested its constitutionality.

A defendant must raise the constitutionality of a statute in the trial court. *State v. Hatton*, 07-2377 (La. 7/1/08), 985 So.2d 709. The defendant never raised the constitutionality of La.Code Crim.P. art. 782 or any other statute in the trial court. Thus, he may not raise it for the first time on appeal. Uniform Rules—Courts of Appeal, Rule 1-3. Further, the Louisiana Supreme Court has repeatedly held La.Code Crim.P. art. 782 to be constitutional. *State v. Bertrand*, 08-2215 (La. 3/17/09), 6 So.3d 738; *State v. Jones,* 381 So.2d 416 (La.1980); *State v. Simmons,* 414 So.2d 705 (La.1982); *State v. Edwards,* 420 So.2d 663 (La.1982). This assignment of error lacks merit.

## EXCESSIVE SENTENCE

The defendant contends his life sentence, with the first twenty-five years without benefit of parole, probation, or suspension of sentence, is excessive. Louisiana Code of Criminal Procedure Article 881.1(E) requires a defendant to make or file a motion to reconsider his sentence within thirty days of imposition of the sentence. A defendant who fails to make or file such a motion is precluded from raising any objection to the sentence on appeal. *State v. White*, 03-1535 (La.App. 3 Cir. 4/28/04), 872 So.2d 588; *State v. Prudhomme*, 02-511 (La.App. 3 Cir. 10/30/02), 829 So.2d 1166, *writ denied*, 02-3230 (La. 10/10/03), 855 So.2d 324.

The defendant here did not object to his sentence or file a motion to reconsider in the trial court. Although he argues on appeal the trial court erred by not considering the factors of La.Code Crim.P. art. 894.1, this issue was not raised

18

in the trial court and "cannot be raised for the first time on appeal." *State v. Hebert*, 08-542, p. 3 (La.App. 3 Cir. 11/5/08), 996 So.2d 688, 690.

In *State v. Bamburg*, 00-675 (La.App. 3 Cir. 11/2/00), 772 So.2d 356, the defendant failed to object to the sentence imposed at the sentencing hearing and did not timely file a motion to reconsider sentence; thus, this court found his excessive sentence claim was barred. *See also State v. Fletcher*, 00-968 (La.App. 3 Cir. 12/6/00), 776 So.2d 1240, *writ denied*, 01-342 (La. 12/14/01), 803 So.2d 986; *State v. Charles*, 00-1611 (La.App. 3 Cir. 5/9/01), 787 So.2d 516, *writ denied*, 01-1554 (La. 4/19/02), 813 So.2d 420; *State v. Williams*, 01-998 (La.App. 3 Cir. 2/6/02), 815 So.2d 908, *writ denied*, 02-578 (La. 1/31/03), 836 So.2d 59. Based on these cases, we find the defendant waived his right to seek review of his sentence.

At the time this offense occurred, La.R.S. 14:43.1 provided a sentencing range of twenty-five years to life imprisonment, with the first twenty-five years to be served without benefits, where the offender was age seventeen or older and the victim was under the age of thirteen. Thus, the defendant received a legal sentence. This assignment of error lacks merit.

## PRESENCE OF GRAND JURY MEMBERS

The defendant argues the grand jury indicted him, but the minutes do not indicate that any members of the grand jury were present during the return of the indictment, that the minute clerk polled the grand jury members, or that the members concurred in the indictment. He cites *State v. Pitts*, 39 La.Ann. 914, 3 So. 118 (1887), in support of his argument. This issue was not raised in the trial court and may not be raised for the first time on appeal. Uniform Rules—Courts of Appeal, Rule 1-3.

# IMPROPER OPENING STATEMENTS

The defendant contends the trial court erred in denying his request for a mistrial when the state referred to his prior convictions during its opening statement. The state's attorney stated:

> Officer Keith Bedwell is expected to testify as to his job with Probation and Parole, how he was in charge of supervising the defendant who has three prior convictions. These convictions are as follows: Under Docket Number 26530, Vermilion Parish, Louisiana, the defendant, Jessie Duplantis, pled guilty to the crime of carnal knowledge of a juvenile who was roughly eleven years of age at the time of the offense. Under Docket numbers 41848 and 41849, Jessie Duplantis pled guilty to two counts of indecent behavior with a juvenile, whose age was ten or eleven at the time of the offense.

> Ladies and gentlemen, the Honorable Judge will give you an instruction that the evidence of these three convictions is to be considered only for the limited purpose that they show the defendant's lustful disposition to children under the age of thirteen.

The trial court, later in the proceedings, held the evidence of the prior convictions to be admissible. A defendant is generally not entitled to a mistrial when the prosecution's opening statement refers to evidence later ruled inadmissible. *State v. Green*, 343 So.2d 149 (La.1977). Clearly when the evidence to which the state referred in its opening statement is later deemed admissible there is no error. The state merely told the jury about evidence it planned to introduce, and it did. The defendant's argument lacks merit.

## CONCLUSION

The defendant's conviction and sentence are affirmed. The trial court is directed to inform the defendant of the provisions of article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received the notice.

**AFFIRMED . REMANDED WITH INSTRUCTIONS.**

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

13-424

STATE OF LOUISIANA

VERSUS

JESSIE JAMES DUPLANTIS

PETERS, J., dissents.

I agree with the summary of the evidence set forth in the majority opinion. However, I disagree that any rational trier of fact could have found that the State of Louisiana (state) proved beyond a reasonable doubt that the defendant committed the offense of sexual battery, even when "viewing the evidence in the light most favorable to the prosecution[.]" *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007).

Any offense against a child is as a particularly heinous crime, and sexual battery is no exception. In the context of this case, sexual battery occurs when a person touches "the . . . genitals of the victim . . . using any instrumentality or any part of the body of the offender" with the criminal intent to do so. La.R.S. 14:43.1(A). Additionally, with regard to a child under the age of fifteen who is touched by a person more than three years older than that child, consent is not a defense. La.R.S. 14:43.1(A)(2). However, every touching of the genitals of a child is not a sexual battery. Louisiana Revised Statutes 14:43.1(B) provides in pertinent part that "normal medical treatment or normal sanitary care shall not be construed as an" act of sexual battery.

Evidence of the criminal intent element in this case is totally absent. Additionally, no physical evidence links the defendant to this offense, and a jury convicted him based solely on H.C.'s confusing, disjointed, and inconsistent testimony together with the erroneously introduced evidence of the defendant's criminal record.

In the videotaped interview, H.C. expressed mixed emotions concerning the relationship between his family and the defendant. On the one hand he suggested that he was no longer living with his mother because the defendant had done some "mean things," and on the other hand expressed a belief that the boyfriend/girlfriend relationship between the defendant and his mother was not a bad thing. With regard to the defendant's actions, he was equally contradictory. At first, he told Ms. Joseph that the defendant touched him "all over on the private" but that he kept his hand still. However, later in the interview, he changed his story to suggest that the defendant moved his hand as he was touching him. Additionally, H.C.'s story to Ms. Joseph concerning the number of times and the manner in which the defendant allegedly violated him varied significantly. Early in the interview, H.C. told Ms. Joseph that the defendant had also touched his private parts with a paddle through his clothing, and later that the defendant had touched his skin inside his clothing. H.C. told Ms. Joseph that when this latter incident occurred, both his mother and half-brother were present in the trailer. Finally, late in the interview H.C. told Ms. Joseph that he was in the bathtub when the defendant came in, touched his private parts, and "that was it."

H.C.'s recitation of the facts was not only internally inconsistent within the interview, but was also different from his trial testimony. In the interview, H.C. asserted that the defendant had touched his private parts four times, and at trial he

testified that the offense only occurred once. Additionally, although he suggested in the interview that he was alone in the trailer with the defendant, when questioned at trial concerning whether he was ever alone in the trailer with the defendant, he responded with the equivocal comment, "I guess."

At trial, H.C. testified that the defendant touched him in his private area "[l]ike maybe once – one time." Additionally, he could not recall if he told anyone that it happened more than once, nor did he recall telling anyone that it never happened at all. The former statement conflicts with the videotaped account given to Ms. Joseph, and the latter conflicts with the trial testimony of Blake Bourque. Blake, who was fifteen years of age at the time of trial, testified that H.C. had pulled him aside at a family gathering in 2012 and told him that "he had been lying . . . about the whole situation about [the defendant] touching him." According to Blake, H.C. was about to cry and told him that an uncle had been the one who actually touched him. When questioned concerning any discussions with Blake, H.C. initially denied having talked to Blake about whether the defendant touched him. Then he changed his testimony to say that he had talked with Blake a couple months before trial, but could not remember whether Blake asked him if the defendant really touched him or if he had told Blake that others were telling him what to say. However, he continued his answer by saying, "I don't think I did. I don't remember or not."

When asked at trial about his statement to Ms. Joseph that the defendant had touched his private parts with a paddle, the following exchange took place:

> A. My old mom almost whipped me with a paddle, I think, maybe a spoon or something. My new mom whips me with a spoon, a wooden spoon.

Q. Do you remember telling anybody anything about being touched with paddles in your private area?

A. I don't think – wait; no. And pretty much that's it.

Q. I guess I didn't understand. Do you remember telling somebody you were touched in your private area with a paddle?

A. I don't – no, I didn't.

Q. You didn't tell anybody about that?

A. I told y'all about it.

Q. Who is "y'all?"

A. Everybody in the judge – I mean, in the courtroom.

Q. When did you do that?

A. Today I think. Yeah, today.

With regard to how he might have been influenced by others in presenting his testimony, H.C. stated at trial that his adoptive parents had told him to simply tell the truth. At the same time, H.C. seemed to be concerned about the possibility of being returned to his biological mother, and in response to questions stated that he "like[s] staying with [his] new mom and dad" and "want[s] to stay with them a whole lot until [he is] a grownup. He stated that he was "kind of worried" about having to return to his mother and commented that he was "trying to say what I need to stay with my new mom and dad, not to go back over there."

In addition to the internal consistencies in H.C.'s pretrial statements and trial testimony, other witnesses contradicted his version of specific events. H.C. asserted that he and the defendant were alone when the offense occurred, yet his biological mother, her father, the defendant's mother, and two of the defendant's brothers all testified that the defendant was never left alone with him. Valerie testified that she and her children lived in the FEMA trailer in 2007 and 2008, and

4

that the defendant never lived with her during that time. According to Valerie, the defendant, because of his probation requirements, spent time with her children only "[w]ith other adult supervision."

Even the question of where the bath took place was the subject of contradiction. When H.C. was asked if he always took a bath in the trailer or if he sometimes took a bath somewhere else, he responded, "[o]nly one time I think I did. I think; I don't know." Not only was the testimony unclear as to whether he took a bath in the trailer only one time or somewhere else one time, but at another time he stated that sometimes he took baths at his grandmother's house. With regard to this issue, H.C. testified that his memories were "kind of old and fuzzy." His biological mother, on the other hand, was clear in her testimony that H.C. always took baths at her parent's home. She explained that this was necessary because the FEMA trailer had no hot water.

With regard to the defendant's prior convictions, La.Code Evid. art. 412.2(A) allows evidence of such prior convictions to be admitted in order to "indicate a lustful disposition toward children" when the defendant "is charged with a crime . . . involving a victim who was under the age of seventeen at the time of the offense[.]" However, the evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" La.Code Evid. art. 403.

In allowing the evidence, the trial court relied on *State v. Williams*, 11-876 (La.App. 5 Cir. 3/27/12), 91 So.3d 437, *writ denied*, 12-1013 (La. 9/21/12), 98 So.3d 334. However, as noted by the majority, in *Williams* the victim was a nine-year-old girl who asserted that the defendant had inappropriately touched her on the top of her clothing, and the underlying carnal knowledge conviction involved a

5

thirteen-year-old girl. The trial court found the cases were sufficiently similar for the evidence to be admissible under La.Code Evid. art. 412.2(A), and the passage of time since the prior conviction did not call for exclusion of the evidence. The fifth circuit affirmed the decision.

The holding in *Williams* is clearly distinguishable from the matter before us. The defendant's prior convictions involve young girls as his victims. The two indecent behavior offenses occurred in 1996, and the carnal knowledge offense occurred in 1989. The offenses at issue in this litigation are not similar in that they involved female victims, and the latest occurred approximately ten years before the charged offense now before us.

The holding in *State v. Archield*, 09-1116 (La.App. 3 Cir. 4/7/10), 34 So.3d 434, *writ denied*, 10-1146 (La. 5/20/11), 63 So.3d 972, as cited by the majority is also distinguishable in that it involved former victims of the same gender; the issue before the court in that particular case related to the question of consent of the victim and the victims of the other crimes testified so that their testimony might aid the court in evaluating the credibility of the current victim. The trial court applied the balancing test and determined that the evidence was admissible under La.Code Evid. art. 412.2 even though it was prejudicial.

In the case now before us, unlike *Williams* and *Archield*, there is no other corroborating evidence to buttress H.C.'s statements. Additionally, the defendant's convictions for offenses against girls fail to show that he has a lustful disposition toward boys. I find that the probative value of the prior convictions did not outweigh the danger of the defendant being unfairly prejudiced by their admittance into evidence, given the fact that the state's total case prior to their submission was the various versions of what happened according to H.C.

6

In finding error in the jury's verdict, I do not suggest that H.C. intentionally fabricated his allegations against the defendant. An act of sanitary care education occurring when H.C. was three or four years old may have taken on an entirely different perspective two to three years later given the tumultuous family history H.C. endured during that interim period. By the time he was interviewed by Ms. Hinton and Ms. Joseph, he had been removed from his mother's care because of her relationship with the defendant, and according to his adoptive father, had been adopted by his aunt and uncle. What he learned from overhearing inappropriate adult conversations during that time and how that knowledge might have shaped his memory of other events will probably never be known, but it is significant that he accused both the defendant and his brother of the same offense after he moved from his mother's home.

From the evidence presented, a rational trier of fact could not have concluded beyond a reasonable doubt that the defendant was innocent or guilty. However, in a criminal trial the rational trier of fact need not determine beyond a reasonable doubt that a defendant is innocent; he or she need only conclude that the evidence establishes his guilt beyond a reasonable doubt. In this case, I cannot say that the evidence establishes the defendant's innocence, but I have to conclude that the evidence is not sufficient to establish his guilt beyond a reasonable doubt. I would vacate the conviction and sentence and enter a verdict of acquittal.